# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2614 | **DATE** | 2/15/2001 |
| **CASE TITLE** | Leggett & Platt, Inc. vs. Hickory Springs Mfg. Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment [60-1] is granted on all counts. Plaintiff's motion for summary judgment [62-1] is denied. Plaintiff's motion for leave to conduct additional discovery on the issue of Hickory's affirmative defense of patent invalidity [74-1] is denied as moot. Defendant's motion to strike exhibit, declaration testimony, argument and Plaintiff's response to certain of Hickory's statements of undisputed facts [76-1] is denied as moot. This case is dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | **Document Number** |
| | Notified counsel by telephone. | | FEB 16 2001 | |
| ✓ | Docketing to mail notices. | | date docketed | 81 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | ⌀ | | |
| | | | DOCKETING 01 FEB 15 PM 12: 12 | date mailed notice |
| RO | courtroom deputy's initials | | | mailing deputy initials |
| | | | Date/time received in central Clerk's Office | |

DOCKETED

FEB 1 6 2001

LEGGETT & PLATT, INCORPORATED, )
)
    Plaintiff, )  No. 99 C 2614
)
    v. )  Judge Ruben Castillo
)
HICKORY SPRINGS MANUFACTURING )
COMPANY, )
)
    Defendant. )

FEB 1 6 2001

## MEMORANDUM OPINION AND ORDER

    This patent infringement case involves competing stackable bedding foundations, sometimes referred to as box spring assemblies. In its First Amended Complaint, Plaintiff Leggett & Platt, Incorporated ("L&P") brought four claims against Defendant Hickory Springs Manufacturing Company ("Hickory"): (1) patent infringement under 35 U.S.C. § 271(a) (literal infringement or infringement under the doctrine of equivalents); (2) patent infringement under 35 U.S.C. § 271(b) (inducing third parties to infringe); (3) tortious interference with contract; and (4) misappropriation of trade secret. The parties have filed cross motions for summary judgment, with Hickory asking for summary judgment on all four counts and L&P seeking partial summary judgment only on counts three and four. For the reasons stated in this memorandum opinion and order, Hickory's motion for summary judgment is granted, and L&P's motion for partial summary judgment is denied.

## BACKGROUND

    The patent at issue in this case, the '064 patent, entitled "Stackable Bedding Foundation" was issued on October 1, 1991 to Robert C. Hagemeister, Steven E. Ogle, and Thomas J. Wells.



All right, title and interest in, to and under the '064 patent was assigned to L&P, which has always been the sole and exclusive owner of the '064 patent. The Background of the Invention portion of the patent explains that prior art box spring assemblies are bulky and costly to ship to the manufacturer for application of padding and covering. In order to reduce the space requirements in shipping the bulky box spring assemblies, "it is customary to compress the assemblies to reduce their individual thicknesses, and, when compressed, to tie them in their compressed state." (R. 73-3, Exs. to Pl.'s Resp. to Def.'s Statement of Facts, Ex. B, '064 patent, col. 1, lines 17-19 "'064 patent.") The '064 invention was designed to solve these problems. The '064 patent claims that the invention is "nestably stackable," *i.e.* it can be stacked with numerous other box spring assemblies for transportation, and, thus, "avoid the need to compress and tie [box spring assemblies] for shipping." (*Id.* at abstract.)

The '064 invention includes five claims: only claims 4 and 5 are at issue in this case. Claim 4 reads as follows:

> A nestably stackable assembly for use in a bedding foundation comprising a rectangular border wire having two parallel sides and two parallel ends, transversely-spaced, parallel, and longitudinally-extending support wires parallel to said border wire sides and having ends connected to said border wire ends, said support wires being formed so as to be generally corrugated along their lengths, said corrugatedly formed support wires having peaks and valleys, said peaks being flattened at their tops, said flattened peaks being generally coplanar with a plane defined by said border wire, said valleys being vertically displaced beneath and intermediate of said flattened peaks, and longitudinally-spaced, parallel, and transversely-extending upper connector wires parallel to said border wire ends and having ends connected to said border wire sides, said upper connector wires being connected intermediate of their ends along their lengths to said flattened peaks of said support wires.

2

The language of claim 5 is nearly identical to that of claim 4, with the exception of additional language in claim 5 that is not in dispute.

On April 20, 1999, L&P filed the complaint in this action, alleging that Hickory's competing box spring assembly, PowerStack, infringed L&P's '064 patent. On August 3 and 10, 2000, this Court held a *Markman* hearing in this case in order to construe the meaning of the term "support wires," found in the '064 patent and issued a written opinion interpreting that term on September 5. *See Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, No. 99 C 2614, 2000 WL 1269363 (N.D. Ill. Sept. 5, 2000). In that opinion, the Court determined that "support wires require that the wire be a continuous strand of wire, which may be formed by butt-welding, end to end, shorter segments of wire." (R. 51, Sept. 5, 2000 Mem. Op. and Order at 12 (internal quotations omitted).) After granting a motion to reconsider from L&P, we decided to clarify the definition to include welds other than butt-welds and explained that "a support wire, regardless of how many original pieces it had prior to welding (*i.e.* if welded at all), must have only two ends." (R. 53, Sept. 20, 2000 Mem. Order at 1.)

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in a light most

3

favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998). However, if the evidence is merely colorable, is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261. Summary judgment is as appropriate in a patent case as in any other case. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984) (cited in *Brita Wasser-Filter-Systeme GMBH v. Recovery Eng'g, Inc.*, 41 F. Supp. 2d 818, 821 (N.D. Ill. 1999)).

## II. Patent Infringement

A patent infringement analysis involves a two-step process. First, the court construes the asserted claims as a matter of law to ascertain their meaning and scope. *See Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). Second, the claims, as construed, are compared to the allegedly infringing device. *See id.* In order for a device to infringe a claim, each claim limitation must be present in the accused device either literally or equivalently. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997) ("[t]he essential inquiry" is whether "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention").

### A. Literal Infringement

A device literally infringes a patent claim only if every limitation of the claim is present in the device exactly. *Lantech, Inc. v. Keip Mach. Co.*, 32 F. 3d 542, 547 (Fed. Cir. 1994). "[A]ny deviation from the claim precludes a finding of literal infringement." *Id.* (citation omitted).

4

Hickory argues that its PowerStack product does not literally infringe L&P's '064 patent. We agree. The claims at issue in the '064 patent require the support wires to be, *inter alia*, "generally corrugated along their lengths" and "[have] peaks and valleys, said peaks being flattened at their tops, said flattened peaks being generally coplanar with a plane defined by said border wire, said valleys being vertically displaced beneath and intermediate of said flattened peaks." ('064 patent, col. 4, line 68, col. 5, lines 1-6, col. 6, lines 8-14.) Furthermore, the claims require that the "upper connector wires [be] connected intermediate of their ends along their lengths to [the] flattened peaks of [the] support wires." (*Id.* at col. 5, lines 10-13, col. 6, lines 18-21.) Given our claim construction of the term "support wire" to have only two ends, Hickory's PowerStack device, and the support wires therein, do not contain any of these express claim limitations.

L&P tries to save its literal infringement claim by arguing that when a section of the support cups in the PowerStack product is welded to some combination of border wire, cross wires, and the long straight wires, it results in a "support wire" that is the same as the support wires found in claims 4 and 5 of the '064 patent. Our claim construction of the term "support wire" precludes such a reading of those claims. A "support wire" must have only two ends. L&P's attempt to demonstrate that a "support wire" is a portion of a wire basket welded to longitudinal end-to-end wires, minus "superfluous" legs is unavailing. (R. 73-1, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5.) The resultant "support wire" that L&P describes has more than two ends, in violation of our claim construction. Thus, we agree with Hickory that the PowerStack product does not literally infringe claims 4 and 5.

## B. Infringement under the Doctrine of Equivalents

In determining whether a product infringes under the doctrine of equivalents, courts are to apply an "element-by-element analytical framework for infringement." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998). Under this framework, "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson*, 520 U.S. at 29. If "the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *See id.* at 38 n.8. The Supreme Court has specifically cautioned against allowing a range of equivalents with "such broad play as to effectively eliminate [an] element in its entirety." *Id.* at 29. The purpose of the doctrine of equivalents is to prevent competitors from pirating the essence of an invention while narrowly avoiding the literal language of the claims. *See Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 856-57 (Fed. Cir. 1988). It is intended to prevent a competitor from making merely insubstantial changes, but is not intended to punish legitimate "designing around" the patent claims. *See London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991).

To determine whether there is infringement under the doctrine of equivalents, we consider whether the '064 patent and Hickory's PowerStack product have only "insubstantial differences." *See Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998). We may also utilize the function-way-result test for infringement under the doctrine of equivalents set forth in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950). Under this test, to prove infringement under the doctrine of equivalents, the patentee must show that the accused device performs substantially the same function, in substantially the same way,

to produce substantially the same result as the claimed invention. *Id.* at 608. The functional equivalent of every limitation must be found in the accused device or there is no infringement. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 660 (7th Cir. 1995) (citing *Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985)).

We find that Hickory's PowerStack product does not infringe the '064 patent under the doctrine of equivalents. Hickory concedes that its product satisfies the function and result prongs of the *Graver* test. (R. 61-1, Mem. Supporting Def.'s Mot. for Summ. J. at 7.) Hickory contends, however, that the PowerStack product does not achieve the result in substantially the same *way* as the '064 invention. L&P's product contains long support wires that extend the length of the '064 product and are generally corrugated so as to stack neatly, one on top of the other. PowerStack, on the other hand, does not have support wires that are generally corrugated along their lengths, peaks that are flattened at their tops and generally coplanar with a plane defined by said border wire, or valleys that are vertically displaced beneath and intermediate of the flattened peaks that enable it to function as claimed in the '064 patent. Instead, PowerStack achieves the result of the '064 patent, *i.e.* a nestably stackable bedding foundation assembly, by utilizing a number of separate three-dimensional support cups, which are welded to a combination of border wire, cross wires, and long wires. These support cups are not "longitudinally extending" or "generally corrugated." While PowerStack contains longitudinally extending long wires, which also may be construed as "support wires," those wires also are not generally corrugated nor do they have peaks and valleys. Instead, the "nestably stackable" result

of the '064 invention is achieved by the particular shape and location of the support cups, which are substantially different from the support wires in the '064 patent.[1]

L&P argues that a particular combination of wires in the PowerStack product is the equivalent of the support wires in the '064 patent. We disagree. L&P picks and chooses what it considers to be "essential" and "non-essential" wires, asks us to consider only the "essential" wires to constitute a single unit and contends that we should use that combination of wires in our determination of infringement. L&P's requested application of the doctrine of equivalents would allow such a broad range of equivalents as to eliminate some elements in their entirety. *Warner-Jenkinson*, 520 U.S. at 29. As noted in *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573 (Fed. Cir. 1996), "the doctrine of equivalents is not a license to ignore or 'erase . . . structural and functional limitations of the claim,' limitations 'on which the public is entitled to rely in avoiding infringement.'" *Id.* at 1582 (quoting *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed. Cir. 1987)). For these reasons, we grant summary judgment in favor of Hickory on Count I.

### III. Inducing Infringement of the Claims

L&P asserts that Hickory has induced third parties to infringe the '064 patent in violation of 35 U.S.C. § 271(b). Because we have found no direct infringement of the patent claims, we cannot find that Hickory has induced third parties to infringe the '064 patent. *Met-Coil Sys.*

---

[1] Furthermore, Hickory's own patent on the PowerStack product is evidence that "is relevant to the issue of whether the change [from the prior art] is substantial." *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996).

*Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986). Consequently, we grant summary judgment in favor of Hickory on Count II.

## IV. Tortious Interference with Contract

In Count III, L&P claims that Hickory has tortiously interfered with the "Employee Invention and Confidential Information Agreement" between L&P and Robert Hagemeister. Hagemeister is former employee of L&P, who was terminated from his employment with L&P in February 1991. (R. 73-2, Pl.'s Resp. to Def.'s Statement of Facts ¶ 79.) According to L&P, "from 1991-1994, Hickory employed Hagemeister as a consultant to, among other things, design a nestably stackable box spring to compete with the nestable box spring L&P was promoting." (*Id.* at ¶ 89.) L&P alleges that, during this time frame, Hagemeister provided Hickory certain allegedly confidential L&P documents. These included a copy of an unfiled patent application, (*id.* at ¶ 155), finite element analysis software, (*id.* at ¶ 165), a collapsible box spring drawing, (*id.* at ¶ 167), and a Tensegrity design for a collapsible box spring, (*id.*). In support of its tortious interference with contract claim, L&P contends that "Hickory intentionally and unjustifiably induced Mr. Hagemeister to breach [the Employee Invention and Confidential Information Agreement] by, *inter alia*, accepting from Mr. Hagemeister certain trade secret and confidential information of L&P." (R. 19, Am. Compl. at 5.) However, Hickory argues, and we agree, that L&P's allegations are based squarely on a misappropriation of trade secrets, as defined by the statute, and thus are preempted by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq. Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 976 (N.D. Ill. 2000) (allegations based on a misappropriation of trade secrets are preempted).

9

L&P argues that *Thomas & Betts* is distinguishable because Hickory, in addition to misappropriating trade secrets, induced Hagemeister to convert L&P's physical property, "including the unfiled patent application, drawings of the Tensegrity box spring concept, and a videotape displaying an FEA software analysis of an L&P spring," which also was protected under Hagemeister's confidentiality agreement. (R. 73-1, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 11.) Thus, L&P contends, its tortious interference with contract claim is not preempted by the ITSA. (*Id.*) L&P's argument is unavailing. L&P's attempt to base its claim on conversion of property does not save it from preemption. In *Thomas & Betts*, the plaintiff, in addition to claiming tortious interference with confidentiality agreement, alleged that defendants "[took] computers, disks, and documents containing confidential information from [the plaintiff.]" *Thomas & Betts*, 108 F. Supp. 2d at 973. In that case, the court decided that Thomas & Betts' ("T&B") factual allegations asserted nothing more than a misappropriation of trade secrets claim. The court explained that although "T&B . . . attempts to avert summary judgment by arguing that its conversion counts are based not only on the theft of confidential information, but also on the taking of the actual computers, disks, and paper belonging to T&B . . . these physical items have little value apart from the information contained therein and therefore we grant summary judgment in favor of defendants." *Id.*

Similarly, in *Ace Novelty*, the plaintiff alleged a claim for conversion of "research and development," which consisted of "plans and ideas." *Ace Novelty Co., Inc. v. Vijuk Equip., Inc.*, No. 90 C 3116, 1990 WL 129510, *3 (N.D. Ill. Aug. 31, 1990). The court explained that the ITSA includes in its definition of "trade secret": "technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list

10

of actual or potential customers or suppliers." *Id.* The court found that the plaintiff's "research and development," alleged converted by the defendant, fell within these examples of trade secrets enumerated in the ITSA and held that the exclusive remedy for the alleged conversion lay in the ITSA itself. In this case as well, the allegedly converted property falls within the examples of trade secrets given in the ITSA and, thus, L&P's conversion claim is preempted. Consequently, we grant summary judgment in favor of Hickory on Count III.

## V. Misappropriation of Trade Secrets

Finally, L&P alleges that Hickory misappropriated trade secrets in violation of the ITSA. Specifically, L&P asserts that Hickory obtained L&P's confidential information including, *inter alia*, the Tensegrity box spring project, collapsible box spring designs, a CAD/FEA system for spring design and analysis, and an un-filed patent application, which allowed "Hickory [to obtain] an illegal head-start in its research, development, and production of the competitive PowerStack box spring product." (R. 62-2, Mem. Supporting Pl.'s Mot. for Partial Summ. J. at 13.) Both parties have moved for summary judgment on this count.

Under Illinois law, a trade secret is defined as any information sufficiently secret to derive economic value from not being generally known by persons who can obtain economic value from it, and subject to reasonable efforts to maintain its secrecy. 765 ILCS 1065/2(d). Misappropriation is: (1) the acquisition of a person's trade secret by another who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of trade secrets without express or implied consent from the owner to the person using or disclosing the trade secret where that person (a) used improper means to acquire it or (b) knew or had reason to know that it was acquired improperly. 765 ILCS 1065/2. The Seventh Circuit, in

interpreting the ITSA, has explained that to establish misappropriation of trade secret, the plaintiff must demonstrate that its confidential information was: "(i) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen from it rather than developed independently or obtained from a third source), and (iii) used in the defendants' business." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992) (citing Ill. Rev. Stat. ch 140 ¶ 352(d))[2] (other citations omitted); *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 927 (N.D. Ill. 1999); *Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166 (Ill. App. Ct. 2000).

## A. Trade Secret

As a preliminary matter, Hickory argues that L&P failed to adequately specify its trade secrets at issue. We disagree. Although L&P's First Amended Complaint may have been lacking in specificity, its summary judgment brief sets forth a clear list of the specific trade secrets at issue in this case.

Hickory also argues that L&P did not keep its confidential information sufficiently secret to merit protection under the ITSA. Specifically, Hickory contends that L&P's "secrets" were disclosed to third parties who had no obligation to maintain the information in confidence. Hickory's evidence that the trade secrets were not kept confidential includes: (1) L&P employee Tom Wells' testimony that the manufacturing process trade secret was disclosed, in March 1993, in a letter to a third party, which carried no obligation to maintain the information in confidence, (R. 61-6, Exs. Supporting Def.'s Mot. for Summ. J., Ex. 10, June 2, 2000 Wells Dep. at 99-101);

---

[2] This provision of the ITSA, cited in *Composite Marine* and now codified at 765 ILCS 1065/2, has not been amended since that case was decided.

and (2) evidence that L&P allowed certain third parties to tour its facility, where its Semi-Flex

product is made, without asking them to sign confidentiality agreements, (R. 71-2, Def.'s Resp.

to Pl.'s Statement of Facts ¶ 8 (citing Sanders Dep. at 144-48)).

L&P, on the other hand, points out that the March 1993 letter sent to the third party did

not disclose any details of its manufacturing process or any other trade secrets, instead disclosing

only a bare minimum of information. (R. 73-1, Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12

(citing R. 73-2, Exs. Supporting Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 7, Wells Decl. ¶¶ 8-

11).) Consequently, L&P argues, the fact that there was no obligation on the third party to keep

this limited information secret does not provide adequate evidence of loss of trade secret status.

Moreover, with regard to factory tours, L&P contends that "third parties who may have access to

L&P trade secret information are required to sign confidentiality agreements or understand and

agree that all such information is proprietary to L&P." (R. 62-3, Pl.'s Statement of Facts ¶ 8

(citing Mar. 1, 2000 Wells Dep. at 149).)

In considering each party's motion for summary judgment on this issue, we must look at

the facts in the light most favorable to the non-moving party. On the question of trade secret

status, we believe that both parties have proferred evidence sufficient to show that there is a

genuine issue of material fact. Thus, we cannot grant summary judgment for either party based

on this element of trade secret misappropriation.

## B. Misappropriation

We turn next to whether, as a matter of law, Hickory misappropriated L&P's trade

secrets, *i.e.* whether the confidential information was stolen rather than developed independently

or obtained from a third source. We find that there is also a genuine issue of material fact

regarding this element of L&P's ITSA claim. To begin with, Hickory denies that it received any

trade secrets from its relationship with Hagemeister. As evidence, Hickory offers Hagemeister's

testimony that the Tensegrity-related drawings did not come from L&P's files, but, in fact, were

drawn after he left L&P. (*Id.* at 9 (citing Hagemeister Dep. at 122-23).) Furthermore,

Hagemeister testified that he did not provide any information on the collapsible box spring

design to Hickory. (R. 71-1, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 11 (citing

Hagemeister Dep. at 139-40).) Also, Hickory contends that Hagemeister never assisted Hickory

in the development of any FEA software. (*Id.* at 12 (citing Hagemeister Dep. at 73-75).) Finally,

Hickory does not dispute that Hagemeister sent the un-filed patent application to Stuart Spiller, a

Hickory employee, but claims that Spiller kept it in his files and did not discuss it with anyone.

(R. 61-1, Mem. Supporting Def.'s Mot. for Summ. J. at 12 (citing Spiller Decl. at ¶ 14, 15).).

In response to Hickory's arguments and proferred evidence, L&P states that Hagemeister

was privy to trade secrets while employed at L&P and, when he performed consulting work for

Hickory, he worked on projects that were in direct competition with products he had designed for

L&P, requiring him to disclose trade secrets to Hickory.[3] Specifically, L&P asserts that

Hagemeister worked 164.25 hours in 1992 to develop a nestably stackable box spring system for

Hickory. (R. 62-2, Mem. Supporting Pl.'s Mot. for Partial Summ. J. at 8) (citing Pl.'s Ex. 26,

correspondence between Spiller and Hagemeister regarding hours summary, and Ex. 28,

Hagemeister's project notes).) L&P also alleges that Hagemeister improperly sent Hickory

---

[3] L&P suggests that Keith Flesher, a former employee of an L&P subsidiary, was also a source of trade secrets to Hickory. (R. 62-2, Mem. Supporting Pl.'s Mot. for Partial Summ. J. at 8.) L&P does not, however, identify any trade secrets that Flesher might have given to Hickory. L&P also does not allege that Hickory used any confidential information gained from Flesher.

copies of L&P's un-filed patent application, confidential drawings on the Tensegrity project, (*id.* at Ex. 1, Nov. 2, 1999 Hagemeister Dep. at 123), and collapsible box spring designs, (R. 62-3, Pl.'s Statement of Facts ¶ 60 (citing Hagemeister Dep. at 140)), as well as a videotape displaying images generated by L&P's finite element analysis ("FEA") software, (*id.* at ¶ 62).

We find that there is a genuine issue of fact regarding whether the second requirement of proving an ITSA violation has been met, *i.e.* whether there was a misappropriation. This is not, however, the end of the inquiry, and we must consider the final requirement of a trade secret misappropriation claim: use in the defendant's business.

### C. Use

The use requirement may be fulfilled by showing that Hickory could not have created its product without the use of L&P's trade secrets. *Mangren Research and Devel. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996) (cited in *Zellweger Analytics, Inc. v. Milgram*, No. 95 C 5998, 1997 WL 667778, at *2 (N.D. Ill. Oct. 21, 1997)). L&P addresses this third requirement by arguing that there are similarities between L&P's trade secrets and Hickory's drawings and products, which demonstrate that Hickory used L&P's trade secrets.

Hickory vehemently denies that it used L&P's trade secrets. Hickory specifically denies that there are similarities between L&P's trade secrets and Hickory's drawings or products that would support a finding that Hickory used L&P's trade secrets. Hickory provides the Court with citations to depositions and declarations to support its assertions.

First, Hickory asserts that Kevin McCraw, a named inventor on the patent for Hickory's PowerStack product, did not hear about the Tensegrity concept from Hagemeister. (R. 71-1, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 9 (citing Def.'s Ex. 16, McCraw Dep. at 13).)

15

Hickory also asserts that McCraw's drawing is not similar to L&P's Tensegrity drawings and explains that "McCraw's design is a series of rigid bent wire forms hingedly connected together to fold like an accordion [, whereas] [t]he "Tensegrity" structure is a series of short straight rods and elastic bands which apparently collapses flat." (*Id.* at 10 (citing McCraw Supp. Decl. ¶¶ 14-16).) In addition, Hickory contends that a drawing in McCraw's notebook, which L&P argues is similar to and based on its proprietary collapsible box spring design, "is for a spring system for a sleeper sofa much more akin to other prior art . . . than anything from Leggett." (*Id.* at 11.) Furthermore, Hickory explains, "a simple visual comparison of the structures found in Mr. McCraw's notebook to [L&P's collapsible box spring design] shows that they are totally different." (*Id.* (citing McCraw Supp. Decl. ¶¶ 10-12).)

Next, Hickory states that McCraw never saw the un-filed patent application and did not know the application existed until after this case started, which was two years after he completed the PowerStack design in 1997. (R. 71-1, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 6 (citing McCraw Decl. ¶ 70).) Hickory's expert witness, Dr. Stoll, compared the contents of the un-filed patent application to Hickory's PowerStack product and the equipment used to produce that product and concluded that the PowerStack product did not embody any material found in that application. (*Id.* (citing Stoll Decl. ¶¶ 80-82).) Dr. Stoll also testified that his tour of both parties' facilities made clear that the processes and equipment used by Hickory are decidedly different from those used by L&P. (R. 61-1, Mem. Supporting Def.'s Mot. for Summ. J. at 14 (citing Stoll Decl. ¶¶ 71-74.) Hickory concludes that L&P's assertion of similarity evidences a complete misunderstanding of McCraw's drawings and the figures in the patent application. (R. 71-1, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 7.) For example, Hickory points out

that the figures in the patent application are two-dimensional wire sections with peaks and valleys in the same plane while McCraw's wire section drawings are two-dimensional representations of a three-dimensional wire form. (*Id.* (citing McCraw Supp. Decl. ¶ 9).) Finally, Hickory argues that McCraw never used FEA software in his activities at Hickory and, furthermore, "the Bedding Division of Hickory 'has never used Finite Element Analysis in the development of anything.'" (*Id.* at 12 (citing Spiller Dep. at 329).)

L&P, on the other hand, baldly argues that there are "remarkable" similarities between McCraw's drawings, done for Hickory, and L&P's alleged trade secrets. For example, L&P asserts that an "accordion" design found in Kevin McCraw's Concepts Notebook is similar to its proprietary Tensegrity design because "each of the hinging members are [sic] sized to allow the unit to be folded into a flat package for shipment." (R. 62-2, Mem. Supporting Pl.'s Mot. for Partial Summ. J. at 9.) L&P also argues that its collapsible box spring designs seem to have "mysteriously appeared in McCraw's concept notebook." (*Id.* at 10.) L&P contends that McCraw's drawings and L&P's collapsible box spring designs created by Hagemeister both "hinge such that they stand up when in use and provide support, but lie flat when the sleeper mechanism is folded." (*Id.* at 11.) Furthermore, L&P alleges that Hickory used L&P's un-filed patent application to create "bedding foundation designs inexplicably similar to and based upon L&P's proprietary, trade secret designs." (*Id.* at 12 (comparing figures 13-19 of the un-filed patent application to drawings from McCraw's notebook).)[4]

---

[4] Finally, with regard to its CAD/FEA software, L&P seems to be arguing that Hagemeister's mailing of videos containing screen display images generated by L&P's trade secret FEA software to Hickory demonstrates Hickory's wrongful use. (R. 62-2, Mem. Supporting Pl.'s Mot. for Partial Summ. J. at 11.) We disagree. Although such a mailing is

In support of its allegations that there is "remarkable" similarity between McCraw's drawings and its own trade secrets, L&P merely cites to pages in McCraw's concept notebook. These citations do not provide evidence of similarity; instead they only point out which of Hickory's drawings is being compared to the L&P trade secret at issue. L&P also cites Plaintiff's Exhibit 49, *i.e.* agenda notes to a Hickory staff meeting, in which the phrase "Hagemeister may be able to provide new ideas" is brought to the Court's attention.[5] This evidence does not support L&P's similarity argument. In light of the requirements of Rule 56, we easily conclude that L&P's motion for summary judgment must be denied.

Furthermore, with regard to Hickory's motion for summary judgment, Hickory has provided the Court with specific evidence, including deposition testimony and declarations, pointing out the absence of a genuine issue of material fact as to the use requirement, which L&P must establish to succeed at trial. L&P has failed to point out any evidence to rebut Hickory's evidence and, instead, relies solely on its unsupported arguments. The Supreme Court made clear that "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). L&P has provided no expert testimony, or even testimony from its own engineers, to dispute Hickory's evidence that Hickory and L&P's designs, processes, and products are very different. L&P also does not properly rebut McCraw's

---

evidence of misappropriation, it does not demonstrate use.

[5] The full quotation reads "Hagemeister may be able to provide new ideas, but will not pursue at this time."

declarations that he did not use L&P's proprietary work in his own designing of Hickory's products. Instead, L&P has chosen to rely on an inference of access and bald statements alleging similarity. We conclude that this tactic is insufficient to defeat summary judgment. Furthermore, we conclude that a rational jury could not return a verdict in favor of L&P with respect to its trade secret claim on the basis of the undisputed evidence submitted by Hickory. Thus, we grant Hickory's motion for summary judgment on Count IV.[6]

## CONCLUSION

For the foregoing reasons, we grant Hickory's Motion for Summary Judgment on all counts. (R. 60-1.) Furthermore, we deny L&P's Motion for Partial Summary Judgment. (R. 62-1). In light of our ruling granting summary judgment in favor of Hickory on L&P's patent infringement claims, we now deny with prejudice, L&P's motion for leave to conduct additional

---

[6] Although not presented directly, L&P seems to suggest that its misappropriation of trade secret claim may also be based on an inevitable discovery theory, articulated in *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). (*See* R. 62-2, Pl.'s Mot. for Summ. J. at 7-8) ("Hagemeister was asked to work on projects that were the same as those he worked on with L&P and which required him to disclose trade secret information to Hickory").) In *PepsiCo*, the Seventh Circuit explained that a party may be held liable for misappropriation of a trade secret when it hires a competitor's employee and places that employee in a position, with similar or identical duties to those performed while working for the competitor, that would result in the inevitable disclosure or use of the trade secret. Liability is found in these circumstances because "unless an employee possesses an uncanny ability to compartmentalize information, he will necessarily" be relying on and using his former employee's trade secrets." *PepsiCo*, 54 F.3d at 1269 (quoted in *C&F Packing Co. v. IBP, Inc.*, No. 93 C 1601, 1998 WL 1147139, at *7 (N.D. Ill. Mar. 16, 1998)).

L&P cannot prevail on such an inevitable discovery theory. In this case, none of the evidence presented indicates that Hickory will inevitably rely on L&P's trade secrets. *See Zellweger Analytics*, 1997 WL 667778, at *3 (where plaintiff presents no evidence that defendant will inevitably use the plaintiff's trade secrets, no liability under *PepsiCo* theory of misappropriation).

discovery on the issue of Hickory's affirmative defense of patent invalidity, (R. 74-1), as moot. We note that Hickory did not rely on this affirmative defense in its motion for summary judgment. Finally, we deny Hickory's motion to strike exhibit, declaration testimony, argument and Leggett's response to certain of Hickory's statements of undisputed facts, (R. 76-1), as moot. We instruct the Clerk of Court to enter judgment accordingly pursuant to Federal Rule of Civil Procedure 58.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: February 15, 2001**